(C. D. 410)

E. H. Scott Radio Laboratories, Inc., *v.* United States

United States Customs Court, First Division

(Decided December 19, 1940)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard H. Welsh* and *Joseph A. Howard, Jr.*, special attorneys), for the defendant.

Before Brown, Oliver, and Walker, Judges.

Walker, Judge: These are suits against the United States brought at the port of Chicago for the recovery of money claimed to have been illegally exacted as customs duties by the collector of customs at that port on an importation of merchandise described on the invoices as "Garrard Record Changer Units". Duty was assessed thereon by the collector at the rate of 30 per centum ad valorem under the provision in paragraph 1542 of the Tariff Act of 1930 for—

Phonographs, gramophones, graphophones, dictaphones, and similar articles, and parts thereof, not specially provided for * * *.

and the claim of the plaintiff is that they are properly dutiable at only 25 per centum ad valorem under the provisions of paragraph 353 of the same act as amended by the reciprocal trade agreement with the United Kingdom reported in T. D. 49753 either as articles not specially provided for, having as an essential feature an electrical element or device, or as parts of radio apparatus, not specially provided for.

There is no dispute as to the character of the articles before us, or their use. They each consist essentially of an electric motor to the shaft of which is attached a turntable. A so-called pick-up arm is so placed that it may be swung over the face of the turntable, and attached to the end of the arm is what is known as a magnetic pick-up head. Provision is made in the latter for the insertion of a phonograph needle. In operation a record is placed on the turntable and the pick-up head is placed with the needle in the outermost groove of the record. Inside the pick-up head are a small magnet and a coil, and the needle is so connected that when the motor is started as it follows the wavy line cut into the groove of the record by the recording apparatus its vibrations cross the lines of force between the north and south poles of the magnet, and as it moves inside the coil an electrical impulse is created, varying with the vibrations, which is carried along wires leading through the arm and out of the unit. In order to reproduce the sound, music, or speech impressed as a wavy line on the record and transformed into the electrical impulses referred to, it is necessary to connect the wires leading from the pick-up to the input of an audio frequency amplifier and sound reproducer either of a radio receiver or of an independent amplifying unit made for that purpose, neither of which is furnished with the record changer units as imported.

The imported article has incorporated in it a device so arranged that after each record is played the pick-up arm is moved and the played record is automatically shifted from the turntable, a new record is placed thereon, and the pick-up replaced in proper playing position, so that a series of records may be played without attention from the operator.

We are satisfied that the imported units were properly classified by the collector under the provisions of paragraph 1542 either as parts of phonographs or parts of articles similar to phonographs.

The basic definition of the word "phonograph" as given in Funk & Wagnalls New Standard Dictionary is—

An apparatus for recording sounds and reproducing them when desired.

It is true that in connection with the definition of "phonograph" most dictionaries refer to the older or mechanical type whereby the phonograph needle was connected to a thin metal or glass diaphragm which

reproduced the sound and transmitted it into a horn arrangement where it was amplified. It is a matter of common knowledge of which we may take judicial notice that within very recent years that type of phonograph has largely disappeared and been replaced by the electrical type of which the articles at bar are part. The term "phonograph" is still commonly applied to such articles, and probably correctly so, as the etymology of the word, which is of comparatively recent invention, shows that it was made up by combining two Greek forms (*phono* + *graph*) and refers to what is done by the article, viz, the reproduction of sound, and not the manner in which it is done.

In the documentary evidence, consisting of descriptions of the article at bar used in advertising it and instructions for its installation, which was offered and received without objection, the article is referred to as a "record changer." It may be that in the future this term and the term "record player," which also seems to be applied to the article without the record changing device, will displace the term "phonograph" and render it obsolete, but at the present time it is still in use and refers to apparatus for reproducing, either by mechanical or electrical means, sounds recorded on plates of wax or other material.

It is not to be overlooked that in addition to providing for phonographs paragraph 1542 also provides for articles similar to phonographs. It is therefore not necessary to base our decision solely upon the fact that the article at bar is part of what is commonly known as a phonograph, for even were that term narrowly construed so as to apply only to the older type of phonograph the provision for articles similar to phonographs would include the record changers here involved, the similarity of purpose and use being obvious.

For the foregoing reasons judgment will issue in favor of the defendant.