(C. D. 950)

Garrard Sales Corp. *v.* United States

United States Customs Court, First Division

(Decided October 3, 1945)

*Jordan & Klingaman* (*Edward F. Jordan* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before Oliver and Cole, Judges

Oliver, Presiding Judge: This suit involves the proper classification of articles described as "Garrard Record Changer Units," which were classified for duty at 30 per centum ad valorem as parts of phonographs under the provisions of paragraph 1542 of the Tariff Act of 1930. They are claimed properly dutiable at 25 per centum ad valorem under paragraph 353, as modified by the trade agreement with the United Kingdom (T. D. 49753), providing for:

Electrical signaling, radio, welding, and ignition apparatus, instruments * * *, and devices; * * * and all other articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, * * *

* * * * * * *

Parts, not specially provided for, * * * of any articles provided for in any item numbered 353 in this schedule, shall be dutiable at the same rate of duty as the articles of which they are parts.

Merchandise identical with that here before us was the subject of a decision of this court in *E. H. Scott Radio Laboratories, Inc.* v. *United States*, 6 Cust. Ct. 1, C. D. 410, wherein these units were held to be properly dutiable as parts of "phonographs * * * and

similar articles." In the present case, counsel for the parties hereto have entered into stipulations as follows:

1. That the merchandise the subject of the protest herein is described on the invoice as "'Garrard' R. C. 8 Record Changer Units" and consists of automatic record changer units.

2. That each of the said articles has an electric motor as an essential feature and integral part thereof.

3. That the said articles are composed in chief value of base metal, not plated with platinum, gold, or silver, and not colored with gold lacquer.

4. That "Garrard" record changer units were not imported into the United States prior to the year 1937.

5. That on and prior to June 18, 1930, and since that time, automatic record changer units similar in all material respects to the "Garrard," performing the same functions and having an electric motor as an essential feature and integral part thereof, were sold and used in the United States.

6. That on and prior to June 18, 1930, and since that time, such similar articles were chiefly used, in the United States, in phonograph-radio combinations, and that their use in phonographs, which were not combined with radios, was very minor.

7. That, since 1937, when the "Garrard" units were first imported into the United States, they were chiefly used, in this country, in phonograph-radio combinations, and that their use in phonographs which were not combined with radios was very minor (exhibit 1-A).

Supplementing the stipulation filed with the court * * * at the first hearing on January 3, 1944, it is hereby further stipulated and agreed:

1. That on and prior to June 18, 1930, and since that time, the "'Garrard' R. C. 8 Record Changer Units," the subject of the protest herein, and the similar "automatic record changer units" referred to in paragraph 5 of the said stipulation, had no uses other than those mentioned in paragraphs 6 and 7 of the said stipulation.

2. That the "phonograph-radio combinations" mentioned in the said paragraphs 6 and 7 of the said stipulation are composed in chief value of metal.

3. That the said "phonograph-radio combinations" have an electric motor as an essential feature and integral part thereof.

4. That the said "'Garrard' R. C. 8 Record Changer Units" and the aforesaid similar "automatic record changer units" are essential parts of the aforesaid "phonograph-radio combinations" and without which they could not function as such (exhibit 1-B).

The president of the importing corporation, an electrical and radio engineer, produced a pamphlet illustrating the Garrard record changer unit, the cover page and second inner page of which were received in evidence (illustrative exhibit A). He described the unit as follows (R. 13):

* * * it is composed of a unit plate on which is mounted the motor and turntable for handling the records, a record changing mechanism which changes the records after each one of them is played, and an electric pick-up which transmits the vibrations to the amplifying systems.

As to its operation he testified (R. 14):

* * * the motor in the record changers in question serves a double purpose. One is to operate the turntable on which the playing record is set, and the other

is to operate the mechanism which changes records as one is played and finished; then the next one is put on by means of the same motor. The changing mechanism is basically simple, provides for one record to be dropped on another as each record is completed. The pick-up transmits vibrations set up by the needle, either by the magnetic-type pick-up or crystal pick-up, into small electrical impulses which, in turn, are amplified through radio or amplifier and then out through the loudspeaker so it can be heard.

\* \* \* They are used principally in radio-phonograph combinations by manufacturers who install them in cabinets.

A representative phonograph-radio combination is shown in the pamphlet marked "Illustrative Exhibit B."

Describing how the sounds are produced, the witness stated (R. 17):

Well, the pick-up in the record-changer mechanism transposes the vibrations that the needle gets when passing over the record into electrical impulses. These are very minute. These pass through the amplifying system, which expands these impulses so that they are powerful enough to actuate the speaker \* \* \*

While the phonograph is in operation the radio cannot be used. When the radio is in use the record changer (phonograph) cannot be used. Both the radio and the phonograph units are operated through the same amplifier and loud-speaker system (R. 18).

This record changer unit can be installed in a separate cabinet and then hooked up to an existing radio, thereby creating a radio-phonograph combination.

In this connection plaintiff's president testified (R. 18):

Q. Now, I will call your attention to the last two inside pages on Illustrative Exhibit A, to some cabinets and the like, apparently some with record changer units in the cabinets. Will you tell us just what those are?

A. Well, these cabinets are cabinets which we made available to people who would want to use a record changer in existing equipment, that is, they may have a good radio but it doesn't have a radio combination, and they are not in the position to change to a radio combination. By putting the mechanism which we import into one of these cabinets for sake of appearance, they can hook the record changer up to their existing radio and thereby get a radio-phonograph combination.

Explaining the difference between the operation of the old phonograph and this mechanism, the witness stated (R.21):

. \* \* \* In the old phonograph the vibrations of the needle—the needle itself, one end of the needle is attached to a round diaphragm, usually 2½ to 3 inches in diameter; may be 2½. That vibration sets up a similar vibration in this diaphragm, which actuated the air in front of it and produced sound waves. Those sound waves went through a horn, a megaphone of some sort, and as it went through it was enlarged, the volume was increased, and you heard it. In the electric pick-up it works differently. You take the today's case of a magnetic pick-up. What you have is a permanent magnet or, in some cases, you might have an electro-operated magnet in some of the very expensive units.

The only material difference between the facts in the case at bar and in *E. H. Scott Radio Laboratories, Inc. v. United States, supra,* is

that in the present record we have stipulated as a fact that the chief use of the imported record-changer units and similar articles is in radio-phonograph combinations. The radio-phonograph combination is really two distinct mechanisms; that is, a radio and a phonograph, each used separately. They cannot both be used at the same time. Each operates independently, but both require an amplifier and loud-speaker to function.

The first question which presents itself is whether or not this device is a "part" of anything, and, if so, of what.

In *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. 322, T. D. 46851, the court stated (p. 324):

It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article.* * * *

The mere fact that two articles are designed and constructed to be used together, does not necessarily make either a part of the other.

In the work entitled "Radio Telegraphy and Telephony" (Duncan and Drew), second edition, New York, John Wiley & Sons, Inc. (p. 456), the "phonograph pick-up" is described as follows:

The music or voice impressions on a phonograph record may be reproduced electrically through the amplifier of the radio receiver, instead of through the sound chamber of the phonograph horn, by a device which is installed in place of the usual phonograph reproducer. The needle of the device is fastened rigidly and mechanically to a metal diaphragm, and as the needle traces through the grooves of the phonograph record in intimate contact with the humps and hollows, it imparts a vibratory motion to the diaphragm.

The diaphragm is in the strong magnetic field produced by the pole pieces of the unit. Its movements generate currents of electricity in the small coils mounted on the magnets. The action is often referred to as *magnetic pick-up*, and it might be said that the function of the diaphragm of the unit is exactly opposite to that of an ordinary telephone receiver.

The minute current induced in the magnet coils is generally sent through the primary of the first audio transformer of the amplifying system. The alternating e. m. f. induced in the secondary is introduced to the input circuit of the first audio amplifier tube as a varying potential between its grid and filament and the reproduction of the sound is accomplished by the audio circuits in the usual way.

In the electrical pick-up, either the ordinary iron diaphragm type may be used, as just mentioned, or the armature of the armature type unit can be utilized.

In "The Radio Engineering Handbook," McGraw-Hill Book Co., Inc., third edition (p. 452), radio-phonograph combinations are described as follows:

Many radio receivers of the console type and a limited number of the table type are provided with a turntable and phonograph pickup. The a-f voltage developed by the pickup is usually applied to the grid of the first a-f amplifier tube in the receiver. Many standard radio receivers are provided with terminals so that connections can be made to a phonograph pickup.

At the outset it should be noted that the term used to describe the imported articles, "Record Changer Units," is misleading. The unit as imported is not a record changer in the sense that it is an attachment or device designed to be attached to a phonograph for the purpose of automatically changing records and to thus provide for a continuous musical program. Such a device might well be taken out of the classification of parts and be considered as an accessory. The imported article here before us consists of a motor-driven turntable to which is affixed as a component part of the entire unit a device which automatically changes the records after they have been played. While the unit as imported can be hooked into an electric circuit, and by the use of current drawn therefrom the motor will cause the table to revolve and the sound arm to travel along the sound grooves in the record, no sounds will be audible unless and until there has been added to the imported unit an appropriate electrical amplification unit and loud-speaker.

It is clear from the record before us that these phonograph units are chiefly used in combination with a radio and that the imported phonograph unit is usually placed in a cabinet with a radio tuner and, when so installed, it uses in common with the radio tuner an audio-frequency amplifier and loud-speaker. However, the imported unit can be, and sometimes is, used separate and apart from a radio and, if hooked up to an amplifier and loud-speaker of its own, will function as a phonograph "not connected with a radio at all" (R.23).

The plaintiff contends that the provision for parts of phonographs in paragraph 1542 includes only such parts as are chiefly used as parts of phonographs and that as the articles in question are chiefly used in radio and phonograph combinations, they are not parts of phonographs; that a combination radio-phonograph is not a phonograph within the meaning of paragraph 1542.

Plaintiff's claim is limited to items on the invoice described as "Garrard R. C. 8 Record Changer Units" and "Garrard R. C. 5 ditto."

The defendant contends that although the chief use of these so-called record changers is in combination with radios, they are not parts of radios, but with the sound reproducer and amplifier constitute a phonograph, and that the issue resolves itself into a question of whether or not a radio-phonograph is an entirety.

In the Summary of Tariff Information prepared for the use of the Committee on Ways and Means (1929), the Tariff Commission reported:

Phonographs, gramophones, and graphophones are instruments for recording or reproducing speech, music, and other sounds. The term phonograph has virtually replaced the other names in current usage. Combination phonograph and radio sets are also being produced.

With this information before it, Congress did not see fit to legislate to distinguish between a combination phonograph-radio and a radio or phonograph. The question of the dutiable status of such a combination radio-phonograph is not before us for decision.

As the unit under consideration is not an essential part of a radio, it does not come within the provision for parts of radios in paragraph 353.

While in a combination radio-phonograph both the radio and phonograph utilize the same amplifying and loud-speaker system, nevertheless they operate independently and are in fact two separate instruments.

It seems that a record-changing device alone might well be considered as an accessory rather than a part of a phonograph, but when, as here, it is coupled with the record-playing turntable, the motor for revolving the record, which is an integral and essential part and without which the phonograph could not function, the imported unit must be treated as an entirety, such as a part of a phonograph. While admitting that this unit is chiefly used in radio and phonograph combinations, its sole use is as part of a phonograph, and a phonograph is nonetheless a phonograph even though it is built into the same cabinet with a radio set and both use the same amplifying and loud-speaker systems. It is also significant that paragraph 1542 provides for parts of phonographs and *similar articles*. There can be no question that this unit, playing as it does phonograph disc records, is similar to a phonograph.

However, there seems to be no doubt that the imported unit is an article "having as an essential feature an electrical element or device" as provided for in paragraph 353 and would be dutiable thereunder if it were not more specifically provided for elsewhere.

*United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. 51, T. D. 47050
*Coxhead Corp.* v. *United States*, 22 C. C. P. A. 96, T. D. 47080
*Forstmann* v. *United States*, 28 C. C. P. A. 222, C. A. D. 149

In the latter case, the court held that the provision of paragraph 353 was not a classification by use and stated:

It is clear to us that in paragraph 353 Congress intended that all articles *ejusdem generis* with those named in the paragraph should, unless more specifically provided for elsewhere, take the rate of duty therein set out.

Following this rule, we hold that the provision for "parts of phonographs * * * and similar articles" (par. 1542) is more specific than the provision for "articles having as an essential feature an electrical element or device" (par. 353).

The protest is therefore overruled and judgment will be entered accordingly.