(C. D. 1973)

ELECTRIC & MUSICAL INDUSTRIES (US), LTD. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 18, 1958)

*Barnes, Richardson & Colburn* (*Edward N. Glad* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: This protest relates to merchandise that is generally described on the invoice as "RECORDED TAPE," with different serial and reference numbers, and which the collector assessed with duty at the rate of 20 per centum ad valorem under paragraph 31 (a) (1) and (2) of the Tariff Act of 1930, as modified by T. D. 51802, as articles in chief value of cellulose acetate. Plaintiff claims that the merchandise is properly dutiable at only 15 per centum ad valorem under the provision in paragraph 1542 of the Tariff Act of 1930, as modified by T. D. 51802, for "Phonographs, gramophones, graphophones, dictophones, and similar articles, and parts thereof, not specially provided for."

Plaintiff's claim is based on the premise that the recorded tapes in question are essential to the operation of a tape recorder and are, therefore, parts of such machine, which, it is alleged, is similar to the articles *eo nomine* provided for in paragraph 1542, as modified, *supra*.

Defendant's contention is that the tape recorder, with which the recorded tapes under consideration are used, is not similar to the articles enumerated in said amended paragraph 1542, because, as stated by Government counsel at the time of trial:

> * * * all employ one principle of operation, reproduction by means of a needle and a vibrating disk. The reproduction here is considerably different. I cannot deny that the end result, the reproduction of sound, is the same, but the manner in which the sound is reproduced is different. That is one of our positions. Secondly, the Government contends that even should the court consider the article which employs these tapes to produce sound from the tapes imported here, is similar to the articles named in paragraph 1542, the particular tapes here do not have analogy, the particular tapes here do not have analogy to the disks which were held to be parts of phonographs, for the reason that the tapes are employed to create a master record, from which are made the many disks.

The record before us consists of the oral testimony of the treasurer of the plaintiff corporation, a sample of a recorded tape, such as those involved herein (plaintiff's illustrative exhibit 1), and a pictorial representation of the tape recorder, with which the merchandise in question is used (plaintiff's illustrative exhibit 2). While the record makes specific reference to one particular imported recorded tape that was not used by plaintiff, the shipment under consideration appears to have included several recorded tapes, identified by various serial and reference numbers, all being substantially the same as the one specifically mentioned. Hence, our discussion herein covers all recorded tapes such as those referred to in the testimony.

Consideration, first, will be directed to a determination whether the "AMPEX 35 Tape Recorder" (plaintiff's illustrative exhibit 2, *supra*) is within the class of articles contemplated by paragraph 1542, as modified, *supra*. The witness characterized the machine as "A tape recorder and play-back machine." In other words, it is an instrument that reproduces sound or replays previous recordings, and it is also used for recordings. As an instrument for reproducing sound or for replaying recordings, its important phase is the top plate, equipped with two hubs (one on the upper right-hand side and the other on the upper left-hand side), a recording head, and a so-called "idler" that controls the movement or action of the tape while the machine is operating. To replay a recording or reproduce sound from the recorded tape, the metal core upon which the tape is wound is fitted into the hub on the left-hand side of the machine, and the tape is threaded through the recording head. Pressing a button releases the tape, which travels around the idler and winds on the blank hub on the right-hand side of the machine. The sound is emitted through a separate speaker that is plugged into the machine and mounted on a jack.

In its capacity as a recorder, the machine under discussion produces a master disk record. To perform this function, there is required a

special cutting lathe "which takes the impulses from this machine and from the tape, and from there you cut your master record," usually made of an acetate base material. The witness described the production of a master disk record as follows (R. 22–23):

You go from this particular tape, through your cutting lathe, and through a series of mixing boxes and angles on your lathe. It needs an experienced engineer to do the cutting there. From there the master goes into what they call a bath, copper bath. From that you create the reverse of that, which is then called a mother. The mother in turn makes the series, a metal mother, which is copper, and then which is nickelplated, creates a series of what we call stampers. The stampers go into the pressing facilities at the plant, and two stampers, top and bottom, then create the disk record as we know it.

The "tape recorder and play-back machine" (illustrative exhibit 2, *supra*) is adapted for, and principally used by, business establishments in audio rooms, which are "listening rooms to see whether something is of proper quality to appear eventually as a record, or as a recorded tape on its own." Occasionally, such machines are used in homes, but, ordinarily, they are not, because "They are rather on the expensive side." The witness testified that the "tape recorder and play-back machine" cannot be used without recorded tapes, such as those under consideration, and that these recorded tapes are essential to the use of that machine.

During the course of his direct examination, the witness described each of the articles that are *eo nomine* provided for in paragraph 1542, as modified, *supra*. In this connection, he testified that "A gramophone is actually a sound box, through which electronically, or acoustically, through the use of a needle on a disk, reproduces sound * * *"; that there is "no difference" between a gramophone and a phonograph; and that the only difference between a gramophone and a graphophone is that the former uses the disk record, and the latter uses the cylinder record. Distinguishing a dictophone from the other three articles, i. e., phonograph, gramophone, and a graphophone, the witness stated (R. 12–13):

A dictophone uses a slightly different method of transmitting sound, in that it uses recorded wire or tape, passing through a head, which takes the place of the needle and head of the gramophone or phonograph, and so transmits, through amplifiers, through your sound box, and from your speaker gives you the sound you hope you are getting.

The witness' direct testimony was concluded with the statement to the effect that dictophones function in the same manner as the "recorder and play-back machine" (illustrative exhibit 2, *supra*).

Plaintiff's uncontradicted testimony that the articles enumerated in paragraph 1542, as modified, *supra*, are instruments designed, and exclusively used, for reproducing sound is supported by recognized dictionary authorities. Funk & Wagnalls Standard Dictionary defines a phonograph as "an apparatus for recording sounds and

reproducing them when desired," and a gramophone as "an instrument of the phonograph type for recording and reproducing articulate speech: invented by E. Berliner." The Oxford Dictionary defines a phonograph as "an instrument, invented by Thomas A. Edison in 1877, * * * by which sounds are automatically recorded and reproduced"; a gramophone as "the name given to one of the instruments devised for permanently recording and reproducing sounds"; and a graphophone as "the name of one of the instruments for recording and reproducing sound." Webster's New International Dictionary defines "Dictaphone" as "A trade-mark for a phonographic instrument, combining a recorder and reproducer, for use in dictating letters and other matter * * *." On the basis of the quoted definitions, it can be said there is substantial sameness between the articles enumerated in said amended paragraph 1542, and the "tape recorder and play-back machine," with which these imported recorded tapes are used. This instrument or machine (illustrative exhibit 2, *supra*), like the phonographs, gramophones, graphophones, and dictophones, which are enumerated in paragraph 1542, as modified, *supra*, is exclusively used for recording and reproducing sound. Its method of operation, as stated by plaintiff's witness, is similar to that of a dictophone. Of greatest significance, however, is that the articles named in the said modified paragraph 1542, and the machine under discussion, accomplish the same end result, i. e., the reproduction of sound by means of previous recordings. Accordingly, we hold that the "tape recorder and play-back machine," with which the imported recorded tapes are used, is within the class of merchandise contemplated by the statutory provision for "similar articles" in paragraph 1542, as modified, *supra*.

Thus, the question before us is whether the recorded tapes in question are classifiable as parts of the "tape recorder and play-back machine," as claimed. In *American Express Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 279, T. D. 33490, phonograph disks were held to be properly classifiable as parts of phonographs. In reaching its conclusion, the Court of Customs Appeals relied on legislative history and also quoted with approval from *American Graphophone Co.* v. *Amet* (74 Fed. 789), with reference to graphophone disks, as follows:

To make the graphophone more widely useful the complainants make many records, embodying music, speech, and other sounds, and distribute these, by sale, to the users of the phone. But the record thus distributed remains *an integral part* of the combined mechanism. It is not a product of the machine, but still a part of it. It is not unusual in many mechanisms that some elements of their combination must be more frequently renewed than others. *The sale of such parts* segregated from the machine is only the replenishing of the combination by a substitution of a new element for the one worn out. [Italics quoted.]

The *American Express Co. et al.* case, *supra*, was followed in *Louis Bauer* v. *United States*, 66 Treas. Dec. 1060, Abstract 29235, that arose

under the Tariff Act of 1930, and held certain aluminum disks, with a round hole pierced through the center and exclusively used for phonograph records, to be classifiable as parts of phonographs. In the present case, plaintiff's undisputed evidence shows that the recorded tapes under consideration were actually used on the "tape recorder and play-back machine," hereinabove discussed, and that they are essential to the operation of that instrument. When these recorded tapes are used with the "tape recorder and play-back machine" for the reproduction of sound, they are replayed to determine the quality of the recording, with the view of deciding whether or not a master record should be produced. In producing a master record, the recorded tapes under consideration lose none of their effectiveness. The original or basic recording thereon retains all of its quality. The master record, however, is so sensitive that it cannot be run on a recording machine without total destruction. On the other hand, the recorded tapes can be "used thousands of times," without loss of their usefulness. The witness' testimony along that line is as follows (R. 23):

Q. Can the master record which you referred to, that is made from this tape, be played on any phonograph machine?—A. No, sir.

Q. Why not?—A. Because this master record, it is so sensitive, you put anything at all on it, and you just lose it.

Q. When you play the tape, Exhibit 1 on Exhibit 2, have you destroyed Exhibit 1?—A. No, sir, that can be used thousands of times.

Q. Would it last as long as a disk record?—A. Far longer.

Q. Why?—A. Because there is no needle that is coming in actual contact with it, and the only possible loss that you could have would be, and this is something we haven't come up against, would be a loss of magnetism which holds the particular track in there. You can't scratch tape, because there is no needle, nothing sharp that comes in contact with it. You might say it is a permanent entity.

The foregoing testimony serves to emphasize the material distinction between the master disk record produced through the use of the imported recorded tapes and the actual use of these recorded tapes on the "tape recorder and play-back machine" (illustrative exhibit 2, *supra*). Master records are neither intended for, nor susceptible of use as, parts of any of the articles enumerated in paragraph 1542, as modified, *supra*. *Columbia Phonograph Co. et al.* v. *United States*, 20 Treas. Dec. 391, T. D. 31351. On the contrary, the exclusive use of these recorded tapes, as shown by the record before us, is as component or constituent parts without which the "tape recorder and play-back machine," hereinabove referred to, could not function as such article. These recorded tapes are, therefore, properly classifiable as parts of that machine. *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. 322, T. D. 46851. Accordingly, we hold the merchandise in question to be properly dutiable at the rate of

15 per centum ad valorem under paragraph 1542, as modified, *supra*, as parts of articles similar to those *eo nomine* provided for in said amended paragraph, as claimed by plaintiff.

Defendant's brief cites the cases of *E. H. Scott Radio Laboratories, Inc.* v. *United States*, 6 Cust. Ct. 1, C. D. 410; and *Garrard Sales Corp.* v. *United States*, 15 Cust. Ct. 89, C. D. 950, reversed in *Same* v. *Same*, 35 C. C. P. A. (Customs) 39, C. A. D. 369. The *E. H. Scott Radio Laboratories, Inc.,* case, *supra,* involved record changer units, which were held to be properly classifiable as parts of phonographs under paragraph 1542 of the Tariff Act of 1930. In the *Garrard Sales Corp.* case, C. A. D. 369, *supra,* our appellate court held that a phonograph and radio combination was not within the purview of paragraph 1542 of the Tariff Act of 1930, and, therefore, excluded certain automatic record changer units used with a phonograph and radio combination from classification under the provision for parts of phonographs and similar articles. Neither of those two cases can be applied favorably toward defendant's position herein.

On the basis of the present record and for all of the reasons hereinabove set forth, the protest is sustained and judgment will be rendered accordingly.