(C.D. 4639)

MATTEL, INC. *v.* UNITED STATES

Court Nos. 70/42525, etc.

(Decided March 8, 1976)

*Musgrave, Welbourn & Fertman* (*Leonard M. Fertman* and *R. Kenton Musgrave* of counsel) for the plaintiff.

*Rex E. Lee,* Assistant Attorney General (*Michael S. O'Rourke* and *Saul Davis,* trial attorneys), for the defendant.

MALETZ, Judge: The question involved in this consolidated action is the proper tariff classification of articles invoiced as "voice units" that were imported from Mexico in 1968 and 1969.

The importations were classified by the government under item 737.90 of the Tariff Schedules of the United States, as modified by T.D. 68–9, as parts of toys, not specially provided for, and assessed with duty at the rate of 31 percent or 28 percent ad valorem, depending upon the date of entry.

Plaintiff contends that the articles are properly classifiable under item 685.32 of the tariff schedules, as modified by T.D. 68–9, as phonographs, dutiable at the rate of 10 percent or 9 percent ad valorem, depending upon the date of entry.

The provisions of the tariff schedules with which we are concerned read as follows:

*General Headnotes and Rules of Interpretation*

10. General Interpretative Rules. * * *

\*    \*    \*    \*    \*    \*    \*

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part. [Emphasis added.]

*Schedule 7, Part 5*

Subpart E. – Models; Dolls, Toys, Tricks, Party Favors

Subpart E headnotes:

1. The articles described in the provisions of this subpart (except parts) shall be classified

in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *. [Emphasis added.]

Classified under [Schedule 7, Part 5, Subpart E]:

Toys, and parts of toys, not specially provided for:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 737.90 | Other_____ | 31% or 28% ad val. [as modified by T.D. 68–9] |

Claimed under [Schedule 6, Part 5]:

| | | |
|---|---|---|
| 685.32 | Record players, phonographs, record changers, turn-tables, and tone arms, and parts of the foregoing_____ | 10% or 9% ad val. [as modified by T.D. 68–9] |

The parties agree that the voice units in question are parts of toys; that in their condition as imported they have no independent play or amusement value; and that they are not used in their condition as imported. Rather, at plaintiff's factory in the United States, they are inserted into dolls, stuffed animals and other objects manufactured by plaintiff.[1] Further, it is undisputed—and the court agrees—that the provision for phonographs in item 685.32 is a specific provision within the meaning of general interpretative rule 10(ij). Thus, if the imported articles are phonographs within the ambit of item 685.32, as claimed, then general interpretative rule 10(ij) and headnote 1 of schedule 7, part 5, subpart E require that this phonograph provision prevail over the item 737.90 "parts of toys" provision. In these circumstances, the single issue is whether or not the importations constitute "phonographs" within the common meaning of item 685.32.

The imported article, which is patented, comes enclosed in a plastic casing which has an eyelet in the side of the housing.[2] It has a turntable, spindle, tone arm assembly, stylus or needle, loudspeaker cone, a clock spring that serves as a driving spring, and a drawstring which is wrapped around a pulley that is attached to the clock spring. The drawstring extends through the tone arm assembly and through the

---

[1] The specific articles here in issue are invoiced variously as "Baby Whisper Voice Unit," "Tom and Jerry Voice Unit," "Gas Station Voice Unit," "Kiddee House Voice Unit," "Spanish Drowsy Voice Unit," and "Mrs. Beasley Voice Unit."

[2] Representative samples of the imported article are contained in the record as plaintiff's exhibits 1 and 1A.

eyelet to the exterior of the casing where the other end is attached to a plastic ring.

The device also contains a disc or record which is permanently affixed by glue or cement to the turntable and cannot be removed without destroying the article. The unit is operated in the following manner, as described by its inventor (R. 36):

> When you pull the string it winds up a spring; when you release the string, the spring turns a turntable. There's a record on the turntable, and the record is played by a stylus or phonograph needle which is in a tone arm. The vibrations on the record are reproduced by the needle moving and pressing against the loud speaker cone. The loud speaker cone transmits the sound into the air.

The record, however, differs from the "conventional" monophonic or stereophonic record. For the conventional record has but one continuous spiral groove or sound track radiating inward to the center, whereas the record in the imported voice unit contains several interleaved sound tracks on the surface. These tracks consist of continuous spiral grooves which start at different points on the circumference and run on nearly parallel paths into the center of the record. Put otherwise, a conventional record has but one spiral groove while an interleaved record has two or more spiral grooves in the same record.[3]

Each spiral in the imported voice unit contains a separate and distinct prerecorded sentence or saying which generally runs from two to three, but not more than four seconds. The records affixed to these units have between eleven and thirteen of such prerecorded statements, thus containing about forty seconds of recorded material.

The imported device is designed and constructed so that the record cannot be played sequentially. When the string which starts the mechanism is pulled, the stylus will fall in a random fashion into any one of the spiral grooves or sound tracks and play only that prerecorded sound which, as noted, runs no longer than four seconds. Thus,

---

[3] Following are illustrations of the spiral grooves contained in the "conventional" and "interleaved" records which are designated "A" and "B" respectively:

an essential characteristic of the article is that the operator can neither control nor determine in advance which sound track will be played. In other words, as the parties stipulated, the article is a "random selection device."

Turning now to the legal aspects, it is fundamental that absent contrary legislative intent, the common meaning of a term controls in construing the tariff statutes. "And this common meaning is, of course, 'a matter of law to be determined by the court, for which purpose the court may consult dictionaries and other authorities, may receive the testimony of witnesses, which is advisory only, and may rely on its own knowledge'." *Mattel, Inc.* v. *United States*, 65 Cust. Ct. 616, 619, C.D. 4147 (1970). See also e.g., *United States* v. *O. Brager-Larsen*, 36 CCPA 1, 3, C.A.D. 388 (1948); *West Coast Cycle Supply Co.* v. *United States*, 66 Cust. Ct. 500, 503, C.D. 4242 (1971).

Against this background, plaintiff called as expert witnesses the inventor of the voice units, who is an electrical engineer; a patent lawyer and engineer with over 30 years of experience in the sound equipment and electronics fields; a manager of technical operations for a company which provides consulting and engineering services to its clients in the magnetic recording and sound reproduction businesses; and a professor of mechanical engineering who is a specialist in mechanical design in vibration and the author of a widely used text on vibration. They testified to the effect that the product in question has all the elements of a phonograph, i.e., a stylus, tone arm, spindle, turntable, drive mechanism and speaker, and is an acoustical phonograph regardless of the random selection feature of the device and the permanence and tonal quality of the records.

In addition, all these witnesses testified that in their expert opinion the merchandise at issue falls within the following dictionary definitions of the word "phonograph":

*Webster's New International Dictionary of the English Language* (unabridged, 1958):

3. An instrument for recording, for reproducing, or for recording and reproducing sounds by the transmission of the vibrations of a stylus connected with a diaphragm and in contact with a groove in a record blank or record that is rotated steadily by the action of a spring or by an electric motor.

*Webster's Third New International Dictionary of the English Language* (unabridged, 1971):

phonograph: an instrument for reproducing sounds by means of the vibration of a stylus or needle following a spiral groove on a revolving circular disc or cylinder.

Plaintiff argues on the basis of the foregoing that the imported articles are phonographs within the common understanding of the

term and within the meaning of the tariff schedules. It further states that an examination of the sample confirms that the imported merchandise contains all of the elements of a phonograph as that term is commonly used since it has a stylus or needle attached to a tone arm, a mechanically activated drive mechanism and a loudspeaker cone.

Defendant, on the other hand, while conceding that the article has the "minimal elements" of an acoustical phonograph, argues that the incorporation of a permanently affixed record in the unit makes the importation something other than a phonograph within the intendment of item 685.32. Defendant also contends that the separate provision for phonograph records in item 724.25 is indicative of a Congressional intent to exclude a phonograph-record "combination" article, as the defendant characterizes the imported merchandise, from a mere "phonograph."

As we have seen, *Webster's Third New International Dictionary* (1971) defines a phonograph as "an instrument for reproducing sounds by means of the vibration of a stylus or needle following a spiral groove on a revolving circular disc or cylinder." [4]

In addition to the dictionaries, helpful also in ascertaining the common meaning of the term "phonograph" are *Louis Wolf & Co.; Bing Wolf Corp.* v. *United States*, 19 CCPA 132, T.D. 45258 (1931) and *E. H. Scott Radio Laboratories, Inc.* v. *United States*, 6 Cust. Ct. 1, C.D. 410 (1940). In *Wolf* the appellate court held that an article comprised of a horn, disk, needle holder, spring, governor and all the other essential parts required to make it play records under six inches in diameter, and which came enclosed in a metal box, was a phonograph, albeit of cheap, flimsy construction, since (among other things) it was capable of playing and did play the complete records provided for it. 19 CCPA at 134. And in *Scott* the court stated that the term "phonograph" referred to "apparatus for reproducing, either by mechanical or electrical means, sounds recorded on plates of wax or other material." 6 Cust. Ct. at 3.

It is also to be noted that the patent on the imported device (plaintiff's exhibit 2), which was issued on January 16, 1962, describes the article as a "multiple speech phonograph" and states (column 1, lines 7–22):

> This invention relates to a phonograph or phonograph device, by way of example in the form of a toy which is operative in response to a simple manipulation to speak or pronounce any one of a number of different sentences. The device may of course also be arranged to produce any other series or group of sounds in response to the said simple manipulation.

---

[4] The 1968 edition of *Webster's* contains an identical definition.

An illustrative example of the adaptation or utilization of the invention is that it may be embodied in a doll and then a child by a simple manipulation such as, for example, the pulling of a drawstring may cause the doll to speak or pronounce a number of different sentences. A feature of the device is that the record used has a plurality of spaced spiral grooves which are separate in a sense that each reproduces a separate and distinct sentence or other distinctive sound.

With these considerations in mind, the court finds that since the imported merchandise contains a turntable, spindle, tone arm, stylus, loudspeaker cone and drive assembly, and is capable of playing a record, it has all the essential features of what is commonly known as a phonograph. And considering that an *eo nomine* provision, such as item 685.32, embraces all forms of the article, e.g., *Nootka Packing Co.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935), including those of inferior quality or lacking in refinements, *Louis Wolf & Co. et al.* v. *United States, supra,* 19 CCPA at 134, the classification issue would be resolved in plaintiff's favor if the article contained only the phonograph components. But it does not.

For the article also includes, as an essential element, a permanently affixed interleaved record which, in the words of the patent (plaintiff's exhibit 2, column 3, lines 8–19)—

* * * in itself is unique and it is unique in its cooperation with the other parts of the phonograph. It has a plurality of individual interleaving spiral grooves as may be seen in FIGURE 4, each of which is a separate sound track on which is recorded a distinctive sound, for example a distinctive complete sentence.

As will be explained more in detail hereinafter, the device possesses the quality of randomness of operation in that upon each operation the needle may engage any one of the various grooves randomly so that the sound that is reproduced cannot be anticipated. This is an intentional objective of the invention. * * *

The patent further states (column 6, lines 64–74):

From the foregoing, those skilled in the art will observe that the invention embraces the fascinating concept of providing a device which will figuratively speak for itself and is adapted to speak or say things which the operator is not able to anticipate, at least not exactly. The invention embraces the concept of a device which a child for example may speak to and then receive a response from, which response is, in effect, chosen and selected by the device itself since the operator does not know which of the sound tracks or spiral grooves on the record will be engaged by the needle.

Based on the court's own observation and operation of a representative sample (plaintiff's exhibit 1A), there is no doubt that the foregoing patent claims accurately describe the imported article. Further,

· it is evident that the permanently affixed interleaved record does· not provide merely an auxiliary or incidental function which facili-· tates the primary purpose of the article.[5] To the contrary, the inter-· leaved record—which is the sound source in a device that will "figuratively speak for itself and is adapted to speak or say things" in a particular manner—is at least of equal importance as the sound reproducing or phonograph portion contained therein. Indeed, it would seem to be the heart of the device.

Accordingly, it must be concluded that the article in controversy is not just another version or model of a phonograph. It is rather a new and distinct commercial entity containing the elements of both a phonograph and a record which, by reason of their special design and permanent attachment, have merged into a single unit possessing certain unusual, if not unique, features. Consequently, this new entity is something more than as well as other than the phonographs encompassed by item 685.32 and is not classifiable thereunder. See e.g., *United States* v. *A. W. Fenton Co.*, 49 CCPA 45, C.A.D. 794 (1962); *United States* v. *New York Merchandise Co.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970); *United States* v. *Acec Electric Corp.*, 60 CCPA 113, C.A.D. 1091, 474 F. 2d 1009 (1973); *United States* v. *Howard Hartry, Inc.*, 60 CCPA 140, C.A.D. 1099, 477 F. 2d 1400 (1973). As our appellate court recently reiterated, merchandise which in fact constitutes more than a particular article is not classifiable as that article. *Pollard Bearings Corp.* v. *United States*, 62 CCPA 61, 64, C.A.D. 1146, 511 F. 2d 568, 571 (1975). See also e.g., *United States* v. *Flex Track Equipment Ltd.*, 59 CCPA 97, C.A.D. 1046, 458 F. 2d 148 (1972); Sturm, *A Manual of Customs Law* (1974) pp. 298–300.

Finally, plaintiff contends that in determining the tariff classification of the imported article the court should give probative weight to the fact that the United States Patent Office issued the patent on the article as a "Multiple Speech Phonograph" under class 274–14 which covers "sound recording and reproducing" with a "stylus feed restoring" characteristic. I cannot agree. For one thing, the patent classification of articles depends upon the manner in which *the applicant* words his claims. Further, the Patent Office's system of classification is one instituted for the convenience of the patent examiners. In short, there is no correlation whatever between the manner in which patents are classifiable by the Patent Office and the manner in

---

[5] Under the tariff acts, "articles are classifiable on the basis of their primary design, construction and function, even though they are capable of performing other auxiliary or incidental operations." *Schick X-Ray Co., Inc.* v. *United States*, 64 Cust. Ct. 430, 435, C.D. 4013 (1970). See also e.g., *United States* v. *Oxford International Corp.*, 62 CCPA 101, C.A.D. 1154, 517 F. 2d 1374 (1975); *Trans-Atlantic Company* v. *United States*, 60 CCPA 100, C.A.D. 1088, 471 F. 2d 1397 (1973); *United Carr Fastener Corp.* v. *United States*, 54 CCPA 89, C.A.D. 913 (1967).

which merchandise is classifiable under the provisions of the Tariff Schedules of the United States.

For the foregoing reasons, it is concluded that the articles in issue were properly classified as parts of toys, not specially provided for, under item 737.90. Plaintiff's claim is overruled and judgment will be entered accordingly.